# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 40970

| | | |
|---|---|---|
| FRANCISCO SERRANO, | ) | |
| | ) | |
| Claimant-Appellant, | ) | Boise, April 2014 Term |
| | ) | |
| v. | ) | 2014 Opinion No. 88 |
| | ) | |
| FOUR SEASONS FRAMING, Employer and | ) | Filed: August 22, 2014 |
| LIBERTY NORTHWEST INSURANCE | ) | |
| CORPORATION, Surety, | ) | Stephen Kenyon, Clerk |
| | ) | |
| Defendants-Respondents. | ) | |

Appeal from the Industrial Commission of the State of Idaho.

The decision of the Industrial Commission is affirmed.

Hammond Law Office, P.A., Caldwell, for appellant. Richard L. Hammond argued.

Law Offices of Kent W. Day, Boise, for respondents. Kent W. Day argued.

_____

HORTON, Justice.

This is an appeal from a decision of the Industrial Commission finding that Francisco Serrano failed to prove that the condition for which he claimed additional benefits was caused by industrial accidents occurring in 2004 and 2008 while he was working for Four Seasons Framing (Four Seasons). We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Serrano worked as a framer for Four Seasons from September 2001 through February 2008. It is undisputed that Serrano was injured in two work-related accidents. The first injury occurred on January 16, 2004. Serrano was working on a roof at a construction site when he fell from a height of approximately fifteen feet, landing on the right side of his body and suffering transverse process fractures to his spine at L2 and L3 in addition to a fractured pelvis. Serrano also suffered shoulder impingement syndrome, which was the main source of his pain following the accident. His shoulder injury required surgery which was performed by Dr. James Johnston

1

on March 19, 2004. Serrano's shoulder recovered well, but his low back pain persisted. In April of 2004, Serrano was still experiencing lower back pain, and Dr. Johnston ordered an MRI of the lumbar spine, which revealed mild degenerative changes and a bulging disc. Dr. Johnston noted that he thought much of Serrano's "pain [was] from degenerative changes" but it was possible that Serrano had "a truly symptomatic disc problem."

Serrano was referred to a pain specialist, Dr. Sandra Thompson, who administered two epidural steroid injections, which successfully alleviated Serrano's low back pain. On June 28, 2004, Dr. Johnston concluded that Serrano's condition was fixed and stable, and he informed the surety, Liberty Northwest Insurance Corp. (Liberty) that Serrano had no permanent impairment. Four Seasons paid for Serrano's medical care, temporary total disability (TTD), and temporary partial disability (TPD) benefits from January 16, 2004 through June 12, 2004.

Serrano returned to Dr. Johnston in November 2004, presenting with severe lower back pain. Dr. Johnston's impression was that the "MRI findings of degenerative disease with disc bulge/herniation may have progressed," but were manageable. Serrano returned to work and ceased seeking medical care for his back pain by late 2004 or early 2005. In May of 2005, Dr. Johnston reviewed an independent medical evaluation of Serrano that had been conducted for the benefit of Liberty and reported that he felt Serrano's "discogenic back problems (that were almost certainly preexisting the industrial injury) were exacerbated by the twenty foot fall that he took from the roof."

The second accident occurred on January 28, 2008, when Serrano slipped on ice and landed on his back. Serrano stopped working for Four Seasons in February 2008, and he first sought medical care for the second accident on February 4, 2008, presenting in the emergency room at St. Alphonsus. He was diagnosed with an acute myofascial strain and prescribed pain medication. Two days later, Serrano went to Dr. Joseph Verska for evaluation. Dr. Verska assessed sciatica, degenerative disc disease and a herniated disc. On February 21, 2008, Dr. Michael Rothman performed an MRI and compared the 2008 MRI to the 2004 MRI. Dr. Rothman concluded that there were "[m]inor L4-L5 degenerative changes, unchanged from prior study" and "[m]ild/moderate degenerative changes [at] L5-S1."

Serrano went to Dr. Beth Rogers for an impairment evaluation on April 21, 2008. Dr. Rogers concluded that Serrano had a whole person impairment of 6% due to the disc protrusion at L5-S1. Dr. Rogers did not take into account the 2004 injury and did not review the 2004 MRI.

Dr. Verska referred Serrano to Dr. Timothy Doerr for a second opinion as to whether Serrano required surgery on his low back. Dr. Doerr saw Serrano on April 22, 2008, and assessed Serrano's lower back pain as "secondary to his degenerative changes at L5-S1 greater than L4-5." Given the absence of neurological impingement, Dr. Doerr recommended physical therapy rather than surgery.

Physical therapy did not alleviate Serrano's pain, and he returned to Dr. Doerr on June 6, 2008. Dr. Doerr ordered a discogram to determine if disc issues were responsible for Serrano's symptoms, and if so, which discs were problematic. Dr. Sandra Thompson performed the discogram on July 16, 2008, and observed no pain at the L3-L4 and the L4-L5 levels. Dr. Thompson was unable to access the space at L5-S1 without irritating the nerve root. Dr. Thompson concluded that Serrano had "non-concordant pain, implying that his pain was not just discogenic in nature." [1]

After steroid injections at L5-S1 failed to provide relief to Serrano, Dr. Doerr ordered another discogram in order to evaluate the L5-S1 level. The second discogram was performed on September 8, 2008, by Dr. William Binegar. Dr. Binegar noted that Serrano began to report pain and pressure at L5-S1 prior to the injection of dye at this level. When the dye was injected, Serrano reported "minor" pain and pressure. Dr. Binegar stated:

> I feel this discogram is indeterminant [sic] for determining if this L5-S1 disc is contributing to his pain. I felt Mr. Serrano was somewhat unreliable in his presentation indicating pain even prior to the injection of dye at this level. Also I will state during the entire injection process he kept asking which disc are we doing.

After reviewing Dr. Binegar's discogram on September 16, 2008, Dr. Doerr concluded "that it is unlikely that L4-5 and L5-S1 is [sic] contributing to any of [Serrano's] symptoms." Dr. Doerr found that Serrano was at maximal medical improvement, that there was no objective evidence upon which to impose work restrictions, and that Serrano had 0% permanent partial impairment. At this point, Liberty ceased paying benefits.

Then, on October 5, 2008, Serrano was attempting to get up from his couch when he felt a pop in his back and immediately began suffering from severe back pain. He was taken to the hospital, and an MRI was ordered. Dr. Peter Angleton treated Serrano at the emergency department and noted that the cause of Serrano's pain was "unclear" but seemed "to be related to

---

[1] Non-concordant pain is pain that is inconsistent with a discogenic source.

lumbar disc disease." On October 13, 2008, Serrano presented to Dr. Thompson, who noted that Serrano was demonstrating a "worsening of his initial symptoms since his accident" and indicated that she believed Serrano was now a surgical candidate. However, by April of 2009, Serrano was no longer considered a surgical candidate. Serrano returned to Dr. Thompson in October of 2009, March of 2010, July 2010, and February 2011, each time reporting severe back pain.

Serrano filed a workers' compensation complaint for the January 16, 2004, injury in December 2008. He began working for a landscaping company in 2009. After the parties began discovery, Serrano filed a motion for a protective order prohibiting Four Seasons from investigating Serrano's immigration status. Serrano argued that being required to answer questions regarding his immigration status would violate his Fifth Amendment privilege against self-incrimination. Although the Commission denied Serrano's motion, Serrano did not respond to Four Seasons' discovery requests. Four Seasons filed a motion to compel and for sanctions. The Commission concluded that Serrano's immigration status was relevant to his entitlement to partial permanent disability (PPD) and, due to Serrano's failure to respond to discovery, the Commission denied Serrano's claim for disability benefits as a sanction.

A hearing on the case was scheduled for July 28, 2011. On July 22, 2011, Serrano filed a motion to amend the complaint to include his claim for the January 28, 2008, accident. The parties agreed to supplement their notices of exhibits, and Serrano filed a separate complaint for the 2008 claim, which was then consolidated with the first complaint and taken up at the July 28, 2011, hearing. The post-hearing deposition of Dr. Doerr was taken on December 21, 2011. The parties submitted post-hearing briefs, and the case was taken under advisement by the Commission on July 26, 2012.

The Commission issued its decision on March 20, 2013. The Commission determined that Dr. Doerr's post-hearing deposition testimony was admissible and, after finding that Serrano was "not an entirely credible witness," concluded that Serrano failed to prove that the medical condition for which he claimed additional benefits was caused by his industrial accidents. Serrano timely appealed. On June 18, 2013, Serrano filed an objection to the agency record and moved to augment the agency record under I.A.R. 28 and 29(a). This motion was denied in part on July 8, 2013.

## II. STANDARD OF REVIEW

4

"When reviewing a decision by the Industrial Commission, this Court exercises free review over the Commission's conclusions of law, but will not disturb the Commission's factual findings if they are supported by substantial and competent evidence." *Knowlton v. Wood River Med. Ctr.*, 151 Idaho 135, 140, 254 P.3d 36, 41 (2011) (citing I.C. § 72–732). "Substantial and competent evidence is relevant evidence that a reasonable mind might accept to support a conclusion." *McNulty v. Sinclair Oil Corp.*, 152 Idaho 582, 584–85, 272 P.3d 554, 556–57 (2012) (quoting *Uhl v. Ballard Med. Prods., Inc.*, 138 Idaho 653, 657, 67 P.3d 1265, 1269 (2003)). This Court will not re-weigh the evidence and "[t]he Commission's conclusions regarding the credibility and weight of evidence will not be disturbed unless they are clearly erroneous." *Knowlton*, 151 Idaho at 140, 254 P.3d at 41.

This Court reviews the Commission's decisions regarding the admission of evidence and the settlement of the record on appeal for an abuse of discretion.

> A three-part test is used when reviewing whether the Commission abused its discretion. This Court determines: "(1) whether the Commission correctly perceived the issue as one of discretion, (2) whether it acted within the outer boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to it, and (3) whether it reached its decision by an exercise of reason."

*Fonseca v. Corral Agric., Inc.*, 156 Idaho 142, 147, 321 P.3d 692, 697 (2014) (quoting *Flowers v. Shenango Screenprinting, Inc.*, 150 Idaho 295, 297, 246 P.3d 668, 670 (2010)).

## III. ANALYSIS

### A. The Commission did not abuse its discretion in admitting the post-hearing testimony of Dr. Doerr.

In his post-hearing deposition, Dr. Doerr opined that Serrano's condition was caused by pre-existing degenerative conditions. Serrano objected to the admissibility of this testimony, arguing that Dr. Doerr's opinion was beyond the scope of discovery provided to him. The Commission disagreed and concluded that "Dr. Doerr was properly disclosed" in April of 2009 and that Dr. Doerr could testify as to Serrano's "alleged injury, medical condition, diagnosis, prognosis" and his medical opinion based on evidence that was already admitted into evidence.

On appeal, Serrano advances two arguments regarding the admissibility of Dr. Doerr's testimony. First, he argues that Four Seasons' Second Motion to Enlarge the Period for Taking Dr. Doerr's post-hearing deposition was untimely because it was filed after the expiration of the original period for taking the deposition under J.R.P. 10(E)(3).

5

This Court reviews the Commission's decision to allow post-hearing deposition testimony for an abuse of discretion. *Cantu v. J.R. Simplot Co.*, 121 Idaho 585, 587, 826 P.2d 1297, 1299 (1992). The Judicial Rules of Practice and Procedure under the Idaho Workers' Compensation Law provide that after the conclusion of the hearing, "the record shall remain open for the submission of expert testimony through post-hearing deposition." J.R.P. 10(E)(1). Notices of depositions must be filed "not later than 10 days prior to the hearing." *Id.* All post-hearing depositions submitted on behalf of the defendant "must be taken no later than 28 days after the conclusion of the hearing." J.R.P. 10(E)(3). However, "upon the filing of a motion showing good cause," the Commission may extend "the time limits within which to notice or take post-hearing depositions" so long as the motion or stipulation to extend the time period is "submitted to the Commission for its approval prior to the expiration of the original period" and sets forth "reasonable grounds" for the extension. *Id.*

Here, Four Seasons filed its notice to take the post-hearing deposition of Dr. Doerr on July 26, 2011. Although this notice was filed only two days prior to the hearing date, Serrano agreed to the late filing after Four Seasons agreed to address Serrano's 2008 claim for the fall on the ice at the upcoming hearing. The post-hearing deposition was set for August 18, 2011, within the twenty-eight day limit. Due to scheduling conflicts, the deposition was rescheduled for October 20, 2011, and Serrano agreed to this extension. On October 25, 2011, Four Seasons filed a second motion to enlarge the period for taking the post-hearing deposition. Four Seasons indicated in its motion that Serrano was contacted and gave his approval to reschedule the deposition to December 1, 2011. The Commission granted the extension finding Four Seasons demonstrated good cause to extend the time for taking the deposition and because Serrano stipulated to the filing.

The motion to enlarge the period for taking the deposition was untimely. However, when reviewing the decision of the Commission, this Court is "limited to the evidence, theories and arguments" that were presented to the Commission below. *Obenchain v. McAlvain Const., Inc.*, 143 Idaho 56, 57, 137 P.3d 443, 444 (2006) (quoting *State v. Vierra*, 125 Idaho 465, 469, 872 P.2d 728, 731 (Ct. App. 1994)). Consequently, we "will not consider arguments raised for the first time on appeal." *Locker v. How Soel, Inc.*, 151 Idaho 696, 701, 263 P.3d 750, 755 (2011). Serrano did not raise his current contention that Dr. Doerr's deposition was untimely under J.R.P. 10(E)(3) before the Commission, and the Commission was never informed of Serrano's

claim that he did not stipulate to the late filing of the second motion to enlarge time. The record before this Court reflects only that Serrano agreed to the late filing, and there is nothing therein that supports Serrano's current claim to the contrary.[2] Thus, we can find no error in the consideration of Dr. Doerr's post-hearing deposition testimony based on the untimely motion to enlarge time.

Serrano's second argument is that Dr. Doerr's post-hearing deposition testimony is inadmissible under I.R.C.P. 26 because Four Seasons failed to properly disclose Dr. Doerr's opinions. Four Seasons responds that Dr. Doerr's deposition testimony simply expanded upon the medical evidence already in the record at the time of the hearing with regard to Serrano's pre-existing conditions and that Dr. Doerr's opinions were properly disclosed.

Procedural matters relating to discovery are governed by the appropriate provisions of the Idaho Rules of Civil Procedure, rather than the Commission's own Judicial Rules of Practice and Procedure. J.R.P. 7(C). Idaho Rule of Civil Procedure 26 imposes a duty to "supplement responses to discovery with respect to the substance and subject matter of an expert's testimony" when the testimony has altered from the initial disclosure. *Edmunds v. Kraner*, 142 Idaho 867, 874, 136 P.3d 338, 345 (2006) (quoting *Clark v. Klein*, 137 Idaho 154, 157, 45 P.3d 810, 813 (2002)); I.R.C.P. 26(e)(1). Nevertheless, the Judicial Rules of Practice and Procedure under Idaho Workers' Compensation Law specifically address the use and proper scope of post-hearing depositions. In particular, J.R.P. 10(E)(4) provides:

> Unless the Commission, for good cause shown, shall otherwise order at or before the hearing, the evidence presented by post-hearing deposition shall be evidence known by or available to the party at the time of the hearing and shall not include evidence developed, manufactured, or discovered following the hearing. Experts testifying post-hearing may base an opinion on exhibits and evidence admitted at hearing as well as on expert testimony developed in post-hearing depositions.

In *Watson v. Joslin Millwork, Inc.*, 149 Idaho 850, 858, 243 P.3d 666, 674 (2010), this Court explained that an expert's opinion provided at a post-hearing deposition may expand upon the previous disclosure so long as the expert's addition of detail is consistent with the opinions that

---

[2] Serrano did attach a letter from his attorney to opposing counsel, dated October 25, 2011, in which his attorney indicated that he could not stipulate to the motion to enlarge time. This letter "is not contained within the agency record and thus is not part of the appellate record before this Court." *Simpson v. Trinity Mission Health & Rehab Of Midland L.P.*, 150 Idaho 154, 156 n.1, 244 P.3d 1240, 1242 n.1 (2010) (citing *Goodman Oil Co. v. Scotty's Duro–Bilt Generator, Inc.*, 147 Idaho 56, 59, 205 P.3d 1192, 1195 (2009); *State ex rel. Ohman v. Ivan H. Talbot Family Trust*, 120 Idaho 825, 827, 820 P.2d 695, 697 (1991).

had been previously disclosed. We review the Commission's decision whether to exclude evidence for abuse of discretion, *Fonseca v. Corral Agric., Inc.*, 156 Idaho 142, 148, 321 P.3d 692, 698 (2014), which is the same standard we apply when reviewing a trial court's determination whether to exclude testimony for a failure to properly supplement disclosures. *See City of Meridian v. Petra Inc.*, 154 Idaho 425, 453, 299 P.3d 232, 260 (2013).

Here, the Commission correctly perceived the issue as one of discretion, explicitly stating in its opinion and order that the decision to exclude expert testimony was committed to its discretion. Further, the Commission acted within the boundaries of its discretion and consistently with I.R.C.P. 26 and J.R.P. 10(E). Dr. Doerr was disclosed as a potential witness in Four Seasons' answers to Serrano's first set of interrogatories, filed in April of 2009. Four Seasons responded that Dr. Doerr was a potential witness who "may be called to testify to any matters at issue, including, but not limited to Claimant's alleged injury, medical condition, diagnosis, prognosis, and opinions." Further, Dr. Doerr indicated the presence of a pre-existing condition in his 2008 records and these records were admitted at the hearing. Specifically, Dr. Doerr's medical progress notes contained the following statement: "I suspect that [Serrano's] low back pain is secondary to his degenerative changes . . . ." Finally, the Commission's decision was reached by the exercise of reason and consistent with applicable legal standards. The Commission noted our holding in *Watson*, Dr. Doerr's progress notes that we have just described, and concluded that his "testimony complies with the admissibility standards described by the court in *Watson*." We are unable to conclude that the Commission abused its discretion by admitting and considering Dr. Doerr's post-hearing deposition testimony.[3]

## B. The Commission did not err in partially denying Serrano's motion to augment the agency record on appeal.

Serrano argues that the Commission abused its discretion by declining to augment the record on appeal with certain audio recordings. Serrano filed a motion to augment the record on appeal on June 18, 2013. Serrano requested, among other things, inclusion of all transcripts and audio recordings of all hearings and telephonic conferences for the dates of July 27 and 28, 2011, December 21, 2010, and August 12, 2010. The Commission concluded that "[t]here are no

---

[3] We note that the Commission articulated an independent basis for its decision on this issue based upon timing considerations. The Commission noted that Dr. Doerr's testimony related only to the 2008 injury and that Serrano had waited until the eve of hearing before seeking to add that claim to the issues to be decided at the hearing. The Commission expressed skepticism as to Serrano's motive for objecting, observing that it appeared that Serrano's objection was "based more on strategic considerations than substantive or equitable ones." Our holding on the alternative ground for the Commission's decision makes it unnecessary to address this issue further.

transcripts or audio recordings for the telephone conferences that occurred on July 27, 2011, December 21, 2010, and August 12, 2010" but ordered that "[t]he hearing transcript and exhibits will be lodged with the Court, as prescribed by the Idaho Appellate Rules." The Commission also noted that "[t]he remaining items to which Claimant refers either do not exist or are not in the Commission's possession."

This Court reviews decisions regarding the settling of the record and transcript on appeal pursuant to I.A.R. 29(a) for an abuse of discretion. *Rizzo v. State Farm Ins. Co.*, 155 Idaho 75, 79, 305 P.3d 519, 523 (2013). On appeal from the Commission, there is no standard transcript, and the transcript must be requested by identifying the date and title of the proceedings. *See* I.A.R. 25(c). While "audio recording or audiovisual recording of testimony given under oath and played during the proceeding shall be reported by the reporter and included in the reporter's standard transcript," the Idaho Appellate Rules do provide for the inclusion of any audio recording of the hearing itself when the written transcript is included. *See* I.A.R. 25(g); I.A.R. 31(a); I.C. § 72-710 ("A stenographic or machine transcription of any proceeding or of testimony adduced at any hearing, shall be taken by the commission.").

Here, the Commission explicitly addressed Serrano's request to augment the record and included the transcript from the hearing on July 28, 2011, and ordered this transcript be "lodged with the Court, as prescribed by the Idaho Appellate Rules." As to Serrano's request for the audio recording from this date, the Commission indicated that it did not exist or was not in the Commission's possession. Because the Commission reviewed Serrano's request under I.A.R. 29(a), it is evident that the Commission understood the decision to augment the record was discretionary. The Commission acted consistently with the rules governing the creation and augmentation of the record on appeal and through the exercise of reason by including the only transcript requested that was in existence. As we recently noted in a different appeal pursued by Serrano's attorney, the Commission does not "have the obligation—much less the ability—to include that which does not exist." *Fonseca*, 156 Idaho at 148, 321 P.3d at 698. For these reasons, we hold that Serrano has failed to demonstrate that the Commission abused its discretion by partially denying his motion to augment the record.

**C. There is substantial and competent evidence supporting the Commission's conclusion that Serrano failed to prove causation.**

The issues to be decided at the July 28, 2011 hearing were whether Serrano was entitled to additional TPD and TTD benefits, whether Serrano was entitled to additional medical care

9

pursuant to Idaho Code section 72-432, and whether Serrano was entitled to permanent partial impairment benefits. However, the Commission did not reach these issues after concluding that Serrano failed to prove that the condition for which he claimed benefits was caused by either his 2004 or 2008 industrial accidents. Serrano argues that there is insufficient evidence to support the Commission's conclusion regarding causation based on the erroneous inclusion of Dr. Doerr's post-hearing testimony.[4] Four Seasons argues that the only evidence to support Serrano's claim to additional benefits are his subjective complaints which were not entirely credible.

"The claimant in a worker's compensation case carries the burden of proving that the condition for which compensation is sought is causally related to an industrial accident." *Duncan v. Navajo Trucking*, 134 Idaho 202, 203, 998 P.2d 1115, 1116 (2000). In fact, "causation is an issue whenever entitlement to benefits is at question." *Gomez v. Dura Mark, Inc.*, 152 Idaho 597, 601, 272 P.3d 569, 573 (2012). The proof required is "a reasonable degree of medical probability" that the claimant's "injury was caused by an industrial accident." *Anderson v. Harper's Inc.*, 143 Idaho 193, 196, 141 P.3d 1062, 1065 (2006). "The Commission may not decide causation without opinion evidence from a medical expert." *Id.* In determining causation, it is the role of the Commission "to determine the weight and credibility of testimony and to resolve conflicting interpretations of testimony," and as such, this Court does not "conduct a *de novo* review of the evidence or consider whether it would have reached a different conclusion from the evidence presented." *Henderson v. McCain Foods, Inc.*, 142 Idaho 559, 565, 130 P.3d 1097, 1103 (2006). Because the Commission is the factfinder, this Court will not disturb conclusions of credibility "unless such conclusions are clearly erroneous." *Id.* at 566, 130 P.3d at 1104.

Here, Serrano seeks benefits for medical costs incurred after Four Seasons ceased paying benefits in 2008 and for TTD and TPD benefits from September 2008 through March 2012, arguing that his continued pain is a result of an injury to a spinal disc caused by his accident in 2004 that was aggravated by his accident in 2008. The Commission relied upon the opinion of Dr. Johnston, Serrano's treating physician, who noted that after Serrano's 2004 accident the MRI showed mild degenerative changes and a herniated disc. Dr. Johnston opined that Serrano's back

---

[4] Serrano devotes three paragraphs of his 51-page opening brief to his thrice-repeated claim that he met his burden of proving causation. Nowhere does he attempt to identify evidence in the record that supports this assertion.

problems were "almost certainly preexisting the industrial injury" but were "exacerbated by the twenty foot fall" he took in 2004. Dr. Johnston did not explain the extent to which the fall exacerbated Serrano's pre-existing injury, nor did he explain whether the exacerbation was permanent or temporary. Further, despite his impression of exacerbated back problems, Dr. Johnston expressed his opinion that Serrano had suffered no permanent impairment as a result of the 2004 fall. The Commission also noted that, after the 2008 fall, the second MRI showed no changes from the 2004 MRI.

Although Serrano has not favored us with citations to the record supporting his claim that he met his burden of proving causation, our review of the record reveals that the primary evidence supporting Serrano's claim of worsening symptoms was Serrano's subjective complaints, which were unsubstantiated by the discograms, and given little weight due to the Commission's finding that Serrano was "not an entirely credible witness."[5] In making this credibility determination, the Commission noted: (1) Serrano's "troubling" behavior during the discogram conducted by Dr. Binegar; (2) Serrano's claims that two physicians had recommended surgery, despite the absence of medical records supporting these claims; and (3) that "Dr. Doerr, Dr. Rogers, and even Dr. Thompson observed that [Serrano] reported symptoms that were inconsistent, non-concordant, or nonorganic." We have no difficulty concluding that the Commission's finding that Serrano was not "entirely credible" is not clearly erroneous.

As of September 16, 2008, Dr. Doerr indicated that Serrano was at maximum medical improvement and that there was no basis to impose work restrictions. After the pop in Serrano's back in October 2008, there was no evidence presented connecting Serrano's pain to the accident other than Dr. Thompson's notes reflecting her impression that Serrano's pain was a result of a "worsening of his initial symptoms since his accident." The Commission observed that "[t]hough it is certainly possible that [Serrano's] disc herniation was caused or worsened by his 2004 accident, it is not enough for [Serrano] to show that it is possible. He must show that it is probable." The Commission found that Serrano failed to meet his burden of proof as to causation. We can find no error in the Commission's decision.

**D. We do not reach Serrano's constitutional claims.**

---

[5] We note that the Commission conducted the hearing itself, rather than referring the matter to a referee. This presumably is because of the nature of the pre-hearing motions and claims that Serrano advanced.

Serrano also raises numerous issues related to the Commission's denial of Serrano's motion for a protective order and the imposition of sanctions in connection with Four Seasons' discovery requests for information regarding Serrano's immigration status. The Commission ultimately denied Serrano's claim for PPD benefits as a sanction for Serrano's failure to respond to discovery directed at ascertaining his immigration status. The Commission concluded this information was relevant to Serrano's entitlement to disability in excess of impairment. Serrano argues that the Commission violated his Fifth Amendment privilege against self-incrimination by imposing these sanctions.

In general, "when a case can be decided upon a ground other than a constitutional ground, the Court will not address the constitutional issue unless it is necessary for a determination of the case." *Olsen v. J.A. Freeman Co.*, 117 Idaho 706, 710, 791 P.2d 1285, 1289 (1990). Because we affirm the Commission's finding that Serrano failed to prove causation, he is not entitled to disability benefits. Therefore, we decline to address Serrano's constitutional claims.

**E. Neither party is entitled to attorney fees on appeal.**

Both parties request attorney fees on appeal. Serrano requests attorney fees pursuant to Idaho Code section 72-804, arguing that Four Seasons' denial of his claim was without reasonable grounds. "Attorney fees are not granted to a claimant as a matter of right under worker's compensation law, but may only be affirmatively awarded under the circumstances set forth in I.C. § 72–804." *Morris v. Hap Taylor & Sons, Inc.*, 154 Idaho 633, 640, 301 P.3d 639, 646 (2013) (quoting *Stevens–McAtee v. Potlatch Corp.*, 145 Idaho 325, 336, 179 P.3d 288, 299 (2008)). "Idaho Code § 72–804 permits the award of attorney fees if it is determined that an employer or its surety contested a workers' compensation claim without reasonable ground." *Mazzone v. Texas Roadhouse, Inc.*, 154 Idaho 750, 761, 302 P.3d 718, 729 (2013). Serrano is not entitled to attorney fees because he was not entitled to compensation. *Id.*

Four Seasons also requests fees on appeal under I.A.R. 41 and Idaho Code section 12-121, arguing that Serrano is simply asking this Court to reweigh the evidence submitted to the Commission. "Because the present action comes to this Court on an appeal from the Industrial Commission, the Defendants cannot be granted attorney fees on appeal pursuant to I.C. § 12–121." *Curtis v. M.H. King Co.,* 142 Idaho 383, 388–89, 128 P.3d 920, 925–26 (2005); *see also Clark v. Shari's Mgmt. Corp.*, 155 Idaho 576, 583, 314 P.3d 631, 638 (2013).

## IV. CONCLUSION

We affirm the Commission's denial of Serrano's request for additional benefits and award costs, but not attorney fees, to Respondents.

Justices EISMANN and W. JONES **CONCUR**.

J. JONES, Justice, specially concurring.

I concur in the Court's opinion. The Commission's factual findings are supported by substantial and competent evidence and Serrano has failed to show otherwise. Indeed, only a minuscule part of Serrano's opening brief was devoted to that issue. Almost two-thirds of the brief was directed at the Commission's pre-hearing order that "the Claimant's claim for PPD benefits shall be omitted as an issue on the claim currently before the Commission." The Commission explained:

> Since Claimant has refused to provide Defendants with a response to discovery intended to ascertain Claimant's immigration status, and since Claimant's status is relevant to Claimant's entitlement to disability in excess of impairment, an appropriate sanction for Claimant's refusal to comply with the discovery order is the striking of his claim for disability benefits from consideration for so long as he continues to refuse to respond to Defendants' discovery requests.

Serrano devotes 37 pages of his opening brief to an attack on this order, claiming that it was a violation of his Fifth Amendment rights to require that he disclose his immigration status and claiming that it had no bearing on his entitlement to PPD benefits.

Serrano's counsel had no justifiable grounds for failing to answer Respondents' discovery regarding Serrano's immigration status. It is somewhat understandable that counsel would resist in light of the Commission's decision in *Jesus Diaz v. Franklin Building Supply*, I.C. 2006-507999 (Idaho Ind. Com. Nov. 20, 2009). A majority of the Commission decided, in effect, that an undocumented worker's compensation claimant cannot qualify for permanent disability benefits because he is not legally eligible to obtain lawful employment in the United States. Commissioner Baskin concluded otherwise, filing a dissent worthy of note. It is unknown why Diaz did not appeal the decision in his case. Likewise, it is unclear why Serrano did not answer the propounded discovery, provide full details of his immigration status, and appeal to this Court in the event his claim was rejected based on the holding in *Diaz*.

The immigration issue is not presently before the Court but, nevertheless, Commissioner Baskin's dissent is instructive on the issue. In relevant part, he said:

13

The parties have conceded, and the majority has found, that Claimant is a covered employee subject to the provisions of the [Worker's Compensation] Act under Idaho Code § 72-204, notwithstanding that his employment is "unlawful." I agree with this conclusion despite the fact that there is some difficulty in ascertaining what the Legislature intended in crafting the provisions of Idaho Code § 72-204. That section provides:

> "**72-204. Private employment – Coverage. –** The following shall continue employees in private employment and their employers subject to the provisions of this law:
>
> (1)     A person performing service in the course of the trade, business, profession or occupation of an employer.
>
> (2)     A person, including a minor, whether lawfully or unlawfully employed, in the service of an employer under any contract of hire or apprenticeship, express or implied, and all helpers and assistants of employees whether paid by the employer or employee, if employed with the knowledge, actual or constructive, of the employer.
>
> (3)     An officer of a corporation.
>
> (4)     "Employment," in the case of private employers, includes employment only in that trade, business, profession or occupation which is carried on by the employer and also includes any of the pursuits specified in section 72-212, Idaho Code, when the employer shall have elected to come under the law as provided in section 72-213, Idaho Code. [I.C., § 72-204, as added by 1971, ch. 124, § 3, p. 422; am. 2006, ch. 213, § 1, p. 688.]

(*Emphasis added.*)

With respect to the provisions of Idaho Code § 72-204(2), there is some difficulty in ascertaining whether the language "whether lawfully or unlawfully employed" is intended to modify "a minor" or "a person." If [a "person"], then the parties, and the majority, have correctly discerned the intention of the Legislature, and the provisions of the Act apply to all employments generally, whether lawful or unlawful. However, if the language in question is intended only to modify the term "a minor," then the provisions of Idaho Code § 72-204 do not lend support to the proposition that the Act applies to all employments, regardless of whether they are lawful or not.

If it was Legislature's intent that the modifying language apply only to minors, it could have crafted the statute differently to make this clear. For example, the Legislative could have stated: "a person, including a minor lawfully or unlawfully employed, . . . ." That the Legislature intended the modifying language to apply to all employments, is also suggested by the provisions of Idaho Code § 72-212. That section exempts certain employments from coverage under the Act, such as casual employment, the employment of domestic servants, etc. If the language

14

"whether lawfully or unlawfully employed" was intended by the Legislature to only modify the term "a minor," then Idaho Code § 72-204 provides no guidance on the question of whether other unlawful employments are subject to the provisions of the Act. This would have provided the Legislature with the opportunity to address whether other unlawful employments are exemption from coverage pursuant to Idaho Code § 72-212. This, the Legislature failed to do, which further supports the conclusion that the modifying language of Idaho Code § 72-204(2) was intended to apply to all employees, and not just minors. For these reasons, I agree with the majority that under the provisions of Idaho Code § 72-204(2) Claimant's unlawful employment is a covered employment under the Act. However, as developed below, I disagree with the majority in its treatment of Claimant's status as an undocumented worker in assessing his entitlement to an award of disability benefits.

Defendants argue that as a prerequisite to the Commission's consideration of permanent partial disability, Claimant bears the burden of first demonstrating that the disability is, at least in part, referable to the accident [-] produced permanent partial impairment. I believe this is a correct reading of the provisions of Idaho Code §§ 72-423 and 72-425. However, Defendants further argue that since Claimant's immigration status leaves him altogether unemployable in the United States, he cannot meet his burden of demonstrating that his loss of earning capacity is, in some respect, <u>caused</u> by his permanent partial impairment.

[The Referee] accepted this argument, concluding that whatever accident [-] produced disability Claimant may have suffered as a result of his permanent partial impairment and related limitations is subsumed by the fact that he has no legal access to the labor market on a post-injury basis. Adopting [the Referee's] decision, the majority reasons that if Claimant cannot legally work in the United States subsequent to the subject accident, then the physical impairment which would otherwise cause some additional disability is rendered irrelevant.[6]

The majority opinion is premised on the assumption that Claimant's lack of <u>legal</u> access to the labor market equates to an <u>actual</u> lack of access to the labor market. This, I believe, ignores facts taught by common experience, facts of which the Industrial Commission must take notice; a real and significant labor market exists for undocumented workers in this state.

One need look no further than the facts of the instance matter to find the confirmation of this conclusion. Claimant, who admits to being an undocumented

---

[6] It is tempting to search for an explanation for the decision to award Claimant 0% disability in the assertion that he did not apply himself to a job search after his industrial injury, and therefore his loss of earning capacity is entirely "volitional." In fact, Claimant testified that he did look for work following his industrial injury, but that he was hampered in this search by his limitations. More to the point, if this case really is like <u>Ruiz v. Blaine Larson Farms, Inc.,</u> 2006 IIC 0314, then the Commission's lengthy discussion of the legality of Claimant's employment in the United States would be unnecessary. Clearly, this case was decided not on the basis of Claimant's work search, but rather on the basis of his status as an undocumented worker.

15

worker, came to the United States in approximately 2004. He lived in Phoenix for one year and found employment performing landscaping work. He then moved to Idaho, where he worked in painting preparation for about a year. In early 2005, Claimant applied for and obtained employment at Franklin Building Supply. Claimant testified that his immigration status has never prevented him from getting a job since he moved to the United States in 2004.

In support of its decision, the Majority has held that in evaluating disability exposure, the Commission is limited to considering the injured worker's ability to engage in <u>lawful</u> activity. The majority reasons that in assessing disability, no one would argue that consideration should be given to an injured worker's ability to work as a hit man, or traffic in illegal drugs, even though such gainful opportunities assuredly exist. By analogy, neither should the Commission consider the fact that undocumented workers may be able to find gainful employment, since such employment is illegal. I would distinguish the hiring of illegal aliens for otherwise lawful work, from the other illegal activities discuss in the majority opinion. These "employments" are illegal due to the nature of the activity involved. The employment of Claimant is illegal, not because of any impropriety associated with the gainful activity, but rather, because of Claimant's <u>status</u> as an illegal alien. In performing its assessment of Claimant's disability, for the Commission to recognize that Idaho employers, wittingly or not, employ undocumented workers does not "offend justice, condone illegal activity and dramatically alter the meaning and evaluation of disability."[7] . . . . Indeed, I believe that to ignore the facts plainly before us, in favor of the fiction that illegal aliens have no labor market in this state, does more to imperil our obligation to fairly administer the workers' compensation laws. Within the ambit of our narrow jurisdiction, the Commission must treat all facts relevant to the determination of Claimant's loss of earning capacity.

Idaho Code § 72-425 provides:

> "**Permanent disability evaluation.** – "Evaluation (rating) of permanent disability" is an appraisal of the injured employee's present and probable future ability to engage in gainful activity as

---

[7] Although it is not within the statutory authority of the Industrial Commission to enforce the provisions of the Immigration Reform and Control Act of 1986 (IRCA), it is worth noting that the majority decision may do more damage to the policy behind that Act, and actually incentivize employers to continue to hire undocumented workers. If, as the majority has found, undocumented workers are not entitled to disability beyond impairment, one is forced to recognize that these savings will be enjoyed by someone, i.e. the employer, or its surety. Instead of discouraging the hiring of undocumented workers (if that is part of the majority's intent in adopting the Referee's decision) the decision actually provides an additional incentive to perpetuate the status quo. Similarly, it seems quite plausible that in specifying that the Workers' Compensation Laws of this state apply to all employees "whether lawfully or unlawfully employed," the Legislature actually intended to discourage employers from engaging in unlawful employment. *See*, Idaho Code § 72-204(2). If those who are unlawfully employed enjoy the same benefits as the lawfully employed, then, arguably, employers will not enjoy any savings by virtue of the unlawful employment of another.

16

> it is affected by the medical factor of permanent impairment and by pertinent nonmedical factors as provided in section 72-430, Idaho Code."

As the majority has found, Claimant's status as an undocumented worker must be included among those "nonmedical" factors which the Commission is required to consider when assessing the vocational impact of Claimant's permanent partial impairment. However, I believe the majority erred when it concluded that Claimant's status as an undocumented worker forecloses consideration of whether he has a labor market in this state notwithstanding his immigration status. The fact that undocumented workers are employed in this state is, as well, a nonmedical factor which the Industrial Commission must grapple with when assessing Claimant's disability.

How then should Claimant's status as an undocumented worker be treated by the Commission in evaluating Claimant's disability? Some jurisdictions that have addressed this issue have determined to evaluate the injured worker's disability by ascertaining what employment opportunities would be available to the undocumented worker "but for" his or her immigration status. *See,* Gayton v. Gage Carolina Metals, Inc., 149 N.C. App. 346, 560 S.E.2d 870 (2002); Economy Packing Company v. Illinois Workers' Compensation Commission, 387 Ill. App. Ct. 3d, 283, 901 N.E.2d 915 (2008). Under this approach, the Commission would ignore Claimant's immigration status and evaluate his disability under the assumption that Claimant is legally entitled to hold employment in the United States. The same criticism I have made of the majority opinion could as well be made against this approach; in both cases, the fact that Claimant is an illegal alien, and the fact that a labor market exists for illegal aliens, is ignored in favor of an all-or-nothing approach.

An approach to evaluating disability in these cases that is more consistent with the humane purposes of the Act requires recognition of the fact that Claimant's status as an illegal alien limited (but did not foreclose) his access to the labor market on both a pre-injury and a post-injury basis.

Claimant is an unskilled laborer. He does not speak English. The vocational evidence adduced at hearing, and discussed in the reports of Barbara Nelson and Mary Barros-Bailey, suggests that Claimant is not possessed of education or transferrable job skills that would allow him to compete for anything but unskilled labor in the United States. Certainly, his pre-injury employment history in the state of Idaho supports this conclusion. As such, Claimant's pre-injury labor market in Idaho consisted of those unskilled jobs which Claimant was physically capable of performing and which were available to Claimant, his status as an undocumented worker notwithstanding.

Obviously, on a pre-injury basis, Claimant's labor market did not include all unskilled work which he was physically capable of performing. Some of the work

17

that Claimant was otherwise qualified to perform on a pre-injury basis was unavailable to him simply because Claimant's false documentation would not have survived vetting by some potential employers.

* * *

In conclusion, the statutory scheme anticipates that the Commission will consider all relevant non-medical factors when assessing disability in a particular case. This, the majority has failed to do. By failing to recognize that a labor market exists for undocumented workers, the majority opinion denies Claimant the compensation to which he is entitled under the Act. Claimant's status as an undocumented worker should not, as a matter of law, foreclose consideration of the issue of disability.

Chief Justice BURDICK concurs.